IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SAMUEL J. MUSGRAVE,

     Petitioner,

  v.                         **Case No. 2:01-cv-780**
                                     **JUDGE GRAHAM**

MARGARET BAGLEY, Warden,      **Magistrate Judge KEMP**

     Respondent.

## REPORT AND RECOMMENDATION

Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  This matter is before the Court on the instant petition, respondent's return of writ, and the exhibits of the parties.

This case involves petitioner's 1998 murder conviction in the Knox County Court of Common Pleas.

> Said charges arose from the beating and drowning death of one Robert Welker. [Petitioner] was one of a group of individuals involved in the incident.  The beating occurred during a party at appellant's house.  After the beating, Mr. Welker's body was dumped in a gravel pit.

Exhibit M to Return of Writ.

## I.  PROCEDURAL HISTORY

On September 10, 1997, petitioner was indicted by the Knox County grand jury on one count of murder, in violation of O.R.C. §2903.02(A), and one count of involuntary manslaughter, in violation of O.R.C. §2903.04(A).  Exhibit A to Return of Writ.  While represented by counsel, petitioner proceeded to jury trial on February 24, 1998, and was found guilty of murder.  On March 2, 1998, petitioner was sentenced to a term of fifteen years to life.  Exhibit E to Return of Writ.  Still

represented by the Knox County Public Defender, on March 13, 1998, petitioner filed a motion for new trial with the trial court on the basis that he was denied a fair trial where "the jury was compelled to endure the threatening presence of a number of witnesses roaming the halls of the courthouse," and because, he alleged, the verdict was not sustained by the manifest weight of the evidence.  Exhibit G to Return of Writ.  On March 26, 1998, the trial court denied the motion. Exhibits H and I to Return of Writ.  Represented by new counsel, petitioner filed a timely appeal of his conviction to the Fifth District Court of Appeals.  He asserted the following assignments of error:

> 1.  Defendant was denied his constitutional right to a fair and impartial jury.
>
> 2.  Defendant was denied a fair trial by reason of cumulative errors committed during the course of the trial whether objected to or not.
>
> 3.  Defendant was denied due process of law when the court allowed misleading and prejudicial evidence concerning tests performed by Capt. Dennis Foster.
>
> 4.  Defendant was denied due process of law when the court failed to give an instruction on the affirmative defense of abandonment.
>
> 5.  Defendant was denied effective assistance of counsel when counsel did not request an instruction on abandonment.
>
> 6.  Defendant was denied the effective assistance of counsel through other errors and omissions by counsel.
>
> 7.  Defendant was denied a fair trial when the judge entered the jury room, commented on the length of the trial so as to coerce the jury to reach a fast verdict.
>
> 8.  Defendant was denied due process of law when the court did not fully define the concept and elements of aiding and abetting.
>
> 9.  Defendant was denied due process of law when the jury was precluded from considering the lesser included offense of felonious assault without finding defendant not guilty.

2

10.  Defendant was denied due process of law when the indictment was amended.

11.  Defendant was denied due process of law when the court did not require juror unanimity to convict.

12.  Defendant was denied due process of law when his motions for judgment of acquittal were overruled.

13.  Defendant was denied due process of law where there is no evidence that defendant purposely caused the death of Robert Welker or that he had a specific intent to cause Welker's death.

Exhibit K to Return of Writ.  On April 24, 2000, the appellate court affirmed the judgment of the trial court.  Exhibit M to Return of Writ.[1]  Still represented by counsel, petitioner filed a timely appeal to the Ohio Supreme Court in which he asserted the same propositions of law that were raised on direct appeal, with the exception of his claim that he was denied a fair trial because the judge improperly entered the jury room and commented on the length of the trial.  Exhibit P to Return of Writ.  On September 20, 2000, the Ohio Supreme Court declined jurisdiction to hear the case and dismissed the appeal as not involving any substantial constitutional question.  Exhibit Q to Return of Writ.  On November 24, 1998, proceeding *pro se*, petitioner also filed a petition to vacate or set aside his sentence, in which he raised a claim of prosecutorial misconduct due to the prosecutor's alleged failure to disclose exculpatory evidence.  Exhibit R to Return of Writ.  On October 20, 2000, the trial court denied the petition.  Exhibit S to Return of Writ.  Almost three years later, on September 12, 2003, the trial court issued findings of fact and conclusions of law regarding its dismissal.  *See* Exhibits to petitioner's *Notice of State Court Proceedings*, Doc. No. 47.  It appears that petitioner thereafter filed an appeal of the trial court's decision to the Fifth District Court of

---

[1]  Petitioner filed an application for reconsideration of the appellate court's decision, Exhibit N to Return of Writ, which was denied on May 26, 2000.  Exhibit O to Return of Writ.

Appeals.  *See id.*  According to petitioner, the state appellate court affirmed the trial court's decision denying his petition for post conviction relief; however, he never filed a timely appeal of the appellate court's decision to the Ohio Supreme Court.  *Id.*

On April 24, 2002, petitioner filed his second *pro se* amended petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.[2]  He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1.  Petitioner was denied due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution when he was found guilty of murder against the sufficiency of the evidence; an argument the state courts rejected.
>
> 2.  Petitioner was denied due process of law and a fair trial in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution due to improper character evidence related to gangs, and other prosecutorial misconduct, an argument the state courts rejected.
>
> 3.  Petitioner was denied a fair trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution when the trial judge 1) had an ex parte communication with the jury and; 2) pressured the jury into a fast and speedy verdict; an argument the state courts rejected.
>
> 4.  Petitioner was denied due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution when

---

[2]  The petition for a writ of habeas corpus was initially filed on August 15, 2001.  On September 9, 2002, proceedings were stayed pursuant to petitioner's request so that he could exhaust his claim of ineffective assistance of appellate counsel.  *See* Doc. #21.  On January 21, 2003, proceedings were reactivated.  Petitioner never pursued his ineffective assistance of appellate counsel claim in the state courts, and this claim was deleted from the habeas corpus petition.  *See* Docs. #23, 24 and 25.  On October 27, 2003, proceedings again were stayed pursuant to petitioner's request so that he could attempt to exhaust state court remedies regarding an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  *See* Doc. No. 41.  On May 20, 2005, proceedings again were reactivated.  *See* Doc. No. 48.  Petitioner was advised to notify the Court within ten days if he wished to amend the petition to include a *Brady* claim.  He failed to do so.  *Id.*  This Court therefore will not address any such allegation here.

4

the jury was precluded from considering a lesser included offense without the jury first finding him not guilty of murder; an argument the state courts rejected.

5. Petitioner was denied due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution when the medical examiner was allowed to give inadmissible testimony as to the cause of death being "most likely" drowning, an argument the state courts rejected.

6. Petitioner was denied effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution in the following four (4) instances, an argument the state courts rejected.

7. Petitioner was denied due process of law and the right to a fair trial in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when the trial court failed to fully define complicity and aiding and abetting and/or give a proper instruction on complicity and aiding and abetting, an argument the state courts rejected.

8. Petitioner was denied due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution when the trial court failed to instruct the jury that unanimity was needed for a conviction, an argument the state courts rejected.

9. Petitioner was denied a fair trial and due process of law in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when, over defense objection, the trial court allowed evidence of a "sock test" into evidence that materially prejudiced petitioner, an argument the state courts rejected.

10. Petitioner was denied due process and the right to a fair trial in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when he was denied an impartial jury; an argument the state courts rejected.

11. Petitioner was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when trial counsel failed to request a jury instruction on accomplices, an argument the state courts rejected.

12. Petitioner was denied due process of law in violation of the Fifth

and Fourteenth Amendments to the United States Constitution when the trial court allowed the indictment to be constructively amended to add a theory of aiding and abetting, an argument the state courts rejected.

13.  Petitioner was denied due process of law and the right to effective assistance of trial counsel in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when trial counsel failed to request a jury instruction on abandonment "voluntary renunciation," an argument the state courts rejected.

It is the position of the respondent that claims three and five are procedurally defaulted, and that the remainder of petitioner's claims are without merit.

## II. PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration.  28 U.S.C. §2254(b), (c).  If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies.  *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).  If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error.  *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule.  *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  "First, the court must determine that there is

6

a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id*. Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id*. This "cause and prejudice" analysis also applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.), *cert. denied*, 474 U.S. 831 (1985).

In petitioner's third claim for relief, he asserts that he was denied a fair trial due to improper comments by the trial judge to the jury during deliberations. This claim is readily apparent from the face of the record, and was properly raised on direct appeal; however, petitioner failed to present the claim to the Ohio Supreme Court.  Further, under Ohio's doctrine of *res judicata* he now may no longer do so.  *See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967).  In petitioner's fifth claim for relief, he asserts that he was denied a fair trial when the medical examiner testified regarding the cause of death.  This claim also is readily apparent from the face of the record, and should have been raised on direct appeal, but was not.  Again, petitioner may now no longer present such claim to the state courts under Ohio's doctrine of *res judicata*.  *State v. Cole*, *supra*; *State v. Ishmail*, *supra*; *State v. Perry*, *supra*.

Next, this Court must determine whether or not the state relied upon the procedural rule at issue to dispose of these claims.  Consideration of claim three is barred by virtue of petitioner's

7

failure to present the claim to the Ohio Supreme Court.  Consideration of claim five is barred by virtue of petitioner's failure to present the claim to any state court.  The state courts therefore were never given an opportunity to enforce the procedural rules at issue due to the nature of petitioner's procedural default of these claims.  This Court deems the second part of the *Maupin* test to have been met as to claims three and five.

Third, this Court must decide whether the procedural rules at issue constitute adequate and independent bases upon which to foreclose review of the petitioner's federal constitutional claims. This task requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims.  *See Maupin v. Smith*, 785 F.2d at 138.  Under this analysis, the procedural rules barring claims three and five constitute adequate and independent state grounds for relief.  The state courts must be given a full and fair opportunity to remedy alleged constitutional defects.  The requirement that all available claims be asserted on appeal serves the state's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity.  Finally, the doctrine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to consider claims on the merits under that doctrine.  *State v. Cole; supra; State v. Ishmail, supra; State v. Perry, supra*.

This Court concludes that petitioner waived his right to present claims three and five for federal habeas corpus review.  Petitioner can still secure review of his claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges.  Petitioner has failed to establish either cause for his procedural defaults or actual prejudice resulting from the alleged constitutional violations.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an

extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333.  After review of the record, the Court does not deem this to be such a case.

### III.  CLAIM ONE

In claim one, petitioner asserts that the evidence was constitutionally insufficient to sustain his murder conviction.  Before a criminal defendant can be convicted consistent with the United States Constitution, there must be sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution.  *Wright v. West*, 505 U.S. 277, 296 (1992)(citing *Jackson,* at 319).  The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt."  *Id.* (quoting *Jackson,* at 326).  "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  *Id.* (quoting *Jackson,* at 326).

The state appellate court made the following findings regarding this claim:

> On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492....
>
> Appellant's challenges can be divided into three theories: 1) the cause of death was not established by the evidence, 2) the element of purposeful intent was not established by the evidence, and 3) he had abandoned the intent to injure Mr. Welker.
>
> CAUSE OF DEATH

9

Appellant argues the evidence did not establish the cause of death. [FN1] The testimony from several witnesses clearly established Mr. Welker was a life in being on August 3, 1999, he attended a party at appellant's house, was beaten, transported to a gravel pit and abandoned at the gravel pit, and was discovered the next day floating in water, dead. T. at 158, 556-557, 564-567, 568-570, 671, 674-677, 681-686, 738-742, 796-798, 799, 801-805. Keith Norton, M.D., the Franklin County Coroner who performed the autopsy on Mr. Welker, testified Mr. Welker sustained head injuries that "were certainly consistent with the person having been rendered unconscious" but "not enough that it would cause anyone to die." T. at 388-389. Based upon his examination and the fact that Mr. Welker's body was discovered floating in water, Dr. Norton rendered the following opinion as to cause of death:

FN1. We note appellant's own trial counsel argued the "medical examiner testified conclusively that Mr. Welker died of drowning and that any beating he sustained definitively would not have resulted in his death." *See*, Appellant's Motion for Acquittal filed March 13, 1998.

* * *it appears that he drowned. There was no other cause of death--you know, natural cause of death like heart attack or anything like that that I saw, and yet there was this injury to the face, which could not have been enough--or to the head that would not have been enough to cause death by itself, and yet with that injury to the head, he might have been unable to protect himself if he had gotten himself in the water, so drowning seemed the most--is the most likely cause of death and is the cause of death in this case.  T. at 390.

We find this opinion, coupled with the facts of the case presented in evidence, is sufficient circumstantial evidence to establish the cause of death. We note circumstantial evidence is on par with direct evidence. *Jenks*.

INTENT

Appellant argues the evidence did not establish that he had formed the requisite intent (purposely) to cause Mr. Welker's death. R.C. 2901.22(A) defines "purposely" as follows:

A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a

10

certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

Appellant argues the facts failed to establish he purposely caused Mr. Welker's death. While it is undisputed appellant participated in the brutal beating of Mr. Welker and the dumping of his body at the gravel pit, appellant argues there was no evidence that he placed Mr. Welker in the water causing his death by drowning. Our inquiry is whether the facts proven by direct and circumstantial evidence constitute sufficient credible evidence of "purposely cause the death of another."

Testimony established appellant and others severely beat Mr. Welker rendering him unconscious. T. at 556-557, 674-677, 738-742. After Mr. Welker fell to the floor, appellant kicked him. T. at 677. Mr. Phillips testified Mr. Fulton suggested taking Mr. Welker's body to the gravel pit "[t]o get rid of him, put him in the water." T. at 678. Appellant was present when this comment was made. T. at 677-678. Appellant assisted in placing Mr. Welker's unconscious body in the bed of the pickup truck, drove with the body to the gravel pit, and assisted in dumping the body near the water. T. at 564-567, 568-570, 681-686. Blood was found in the immediate vicinity of the water. T. at 158. Mr. Welker was breathing when his body was removed from the pickup truck. T. at 566.

Upon review, we find this patchwork of facts established that appellant actively participated in the beating rendering Mr. Welker unconscious, was aware of the plan to dispose of the body in the water at the gravel pit, and actively participated in the disposal of the body. These facts are sufficient to establish "purpose."

ABANDONMENT

Appellant argues the evidence established that he had abandoned the crime of murder. Appellant cites to his own statement that he told Mr. Fulton it would be "stupid" to take Mr. Welker's body to the gravel pit and dispose of it in the water. T. at 802. However, appellant's subsequent actions negate any claim of abandonment. Appellant helped carry Mr. Welker's body to the pickup truck, helped remove the body from the pickup truck, dropping the body causing Mr. Welker's head to strike the ground, and helped carry the body to the gravel pit in the immediate vicinity of the water. T. at 564-567, 568-570, 681-686, 803- 805. Appellant then shared in the money

> taken from appellant, and played an active role in disposing of Mr. Welker's vehicle and other evidence. T. at 583, 808-810, 830-831.
>
> Upon review, we find sufficient evidence presented to the jury, if believed, to support appellant's conviction and no manifest miscarriage of justice.

Exhibit M to Return of Writ.

These findings are entitled to a presumption of correctness pursuant to 28 U.S.C. §2254(e):

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, the decision of the Ohio Court of Appeals is binding on this Court unless it is contrary to

clearly established federal law or was based on an unreasonable determination of the facts of record:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).  Upon review of the entire record, this Court concludes that petitioner has failed

to establish that the state court findings in this case are so unreasonable as to justify federal habeas

corpus relief.  *See Williams v. Taylor*, 529 U.S. 362 (2000).

Petitioner was convicted of purposely causing the death of Robert Welker on August 3, 1997

under O.R.C. 2903.02(A) which provides in relevant part:[3]

> No person shall purposely cause the death of another[.]

As noted by the state appellate court, under Ohio law,

> [a] person acts purposely when it is his specific intention to cause a
> certain result, or, when the gist of the offense is a prohibition against
> conduct of a certain nature, regardless of what the offender intends
> to accomplish thereby, it is his specific intention to engage in conduct
> of that nature.

O.R.C. §2901.22(A).  Further,

> [a] person is presumed to intend the natural, reasonable and probable
> consequences of his voluntary acts, *State v. Seiber* (1990), 56 Ohio
> St.3d 4, 13, 564 N.E.2d 408, 419; *State v. Thomas* (1988), 40 Ohio
> St.3d 213, 217, 533 N.E.2d 286, 290, and intent can be determined
> from the surrounding facts and circumstances, *see State v. Johnson*
> (1978), 56 Ohio St.2d 35, 38, 10 O.O.3d 78, 80, 381 N.E.2d 637,
> 640; *State v. Robinson* (1954), 161 Ohio St. 213, 53 O.O. 96, 118
> N.E.2d 517, paragraph five of the syllabus.

*State v. Carter*, 72 Ohio St.3d 545, 554 (1995).

> Because the intent of an accused dwells in his or her mind and can
> never be proved by the direct testimony of a third person, it must be
> gathered from the surrounding facts and circumstances, and... intent
> to kill may be proven by inference.

---

[3] The Bill of Particulars provided:

On or about the 3rd day of August, 1997, in the County of Knox, State of Ohio,
Samuel J. Musgrave did commit murder by purposely causing the death of Robert
Welker contrary to and in violation of Section 2903.02(A) of the Revised Code of
Ohio... More specifically... Samuel J. Musgrave purposely caused and/or
purposely aided or abetted another in causing the death of Robert Welker by
means of intentionally holding, choking and striking Robert Welker and/or
intentionally disposing of Robert Welker's body in a manner which would cause
his death by drowning in the event that he was not already dead.

Exhibit B to Return of Writ.

13

*State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

> A jury may infer an intention to kill where the natural and probable consequence of a defendant's act is to produce death and the jury may conclude from all the surrounding circumstances that a defendant had an intention to kill. *State v. Edwards* (1985), 26 Ohio App.3d 199, 200, 499 N.E.2d 352, citing *State v. Robinson* (1954), 161 Ohio St. 213, 118 N.E.2d 517.

*State v. Waddell,* unpublished, 2000 WL 1154289 (Ohio App. 10 Dist. Aug. 15, 2000).

Petitioner does not dispute the factual findings of the state appellate court.  For the reasons discussed at length by the state appellate court, this Court likewise concludes that the evidence, when viewed most favorably to the prosecution, *see Jackson v. Virginia, supra*, was constitutionally sufficient to sustain petitioner's murder conviction.

Claim one is without merit.

## IV.  CLAIM TWO

In claim two, petitioner asserts that he was denied a fair trial due to the improper admission of character evidence and prosecutorial misconduct.  Petitioner complains of the following testimony and comments made by the prosecution during his cross-examination:

> Q.  He's too young to be in your gang?
>
> A.  It's not a gang, sir.
>
> Q.  It's not a gang?
>
> A.  It's a group of friends.
>
> Q.  At Grand Jury, why was it this whole group of kids had these blue handkerchiefs hanging out of their pockets?
>
> [DEFENSE COUNSEL]: Objection.
>
> COURT: I'm going to sustain the objection.  You don't need to answer that question.  Next question.

14

Q.  Do you belong to a gang?

A.  No, I don't.  I belong to a group of friends that I hang out with regularly.

Q.  Does Derek belong to a gang?

A.  Not that I'm aware of.  I know Taz says he is in a gang.  Yeah.
He has tattoos of gang stuff on his arms and stuff.

Q.  Are you familiar with a gang the Riverside Crips?

A.  I've heard of it.

Q.  But you're not in that gang?

A.  No, I'm not.

Q.  Why then, are the symbols of that gang painted all over your
bedroom?

A.  I know people who were, though.  Nile Hill.

Q.  You tell the jury which of those gang symbols is not on the walls
of your bedroom?

COURT: Why don't you identify for the record what you're showing.

[PROSECUTOR]: I'm showing a series of gang symbols displayed
on a transparency.

***

A.  I recognize some of them, but – I don't know about the one on the
bottom right there.  I don't remember that one.

Q.  Okay.

A.  But I remember seeing some of those.

Q.  Okay.  And your walls were virtually plastered with these gang
symbols, weren't they?

A.  They were at one time with washable marker.

15

Q.  When were they on there?

A.  Probably a couple of years ago.

Q.  Perhaps like last summer?

A.  Last summer?

Q.  Yeah.

A.  I'm not sure.  I think it was longer than that.

Q.  And they're no longer on there?

A.  No, they're not.

Q.  Because someone in a position of authority told you to take them off?

A.  They didn't tell me to take – I just took them off.

Q.  All right.  What do those symbols mean by the way?

A.  I'm not in a gang, sir.  I couldn't tell you.  But I know people that say they're in gangs.  Yeah.

Q.  You drew them on your walls, didn't you?

A.  Did I draw them?

Q.  Yeah.

A.  I drew stuff on my walls, but I didn't draw anything that's up there.

Q.  Who drew those on your walls?

A.  Nile Hill knows a lot of stuff like that.  He draws a lot of stuff like that.

Q.  You let him do that on your walls?

A.  Yes, I did.

Q.  And you drew quite a bit on the walls yourself; correct?

16

A.  Yeah.

***

[DEFENSE COUNSEL]: Your Honor, I'm going to object to this continuing line of questioning unless it relates somehow to Bobbie Welker's death.

*Transcript,* pp. 833-838.

Q. ... The fighting – the beating took place in this front room; correct?

A.  Correct.

Q.  And your dad was passed out on the couch during this procedure?

A.  I don't recall where he was, sir.

Q.  Your dad's a bad drunk, isn't he Sam?

A.  Yeah, he sure is.

*Id.*, at 826.

Q.  So he gave blood money to you and to Matt and to Taz?

[DEFENSE COUNSEL]: Objection.  If he defines what blood money is.

COURT: Overrule the objection.  Let's continue.

*Id*., at 832.

Q.  Somebody made it necessary – showing State's Exhibit 47 – for Dr. Bowers to come out to the pond and declare a 20-year-old boy in the height of his life dead.  Wouldn't you agree?

A.  Yes.

Q.  Somebody caused Jack Welker to go out one Monday evening in August to a stark gravel pit and identify the lifeless, naked, wet, beaten body of his oldest son.  Isn't that correct?

*Id.*, at 856.  Petitioner also asserts that the prosecutor improperly "commented on the fact that

17

petitioner did not call any witnesses listed on his witness list." *See Second Amended Petition*.

The state appellate court made the following findings regarding this claim:

> Appellant argues he was prejudiced by... improper testimony referring to gangs and improper remarks by the prosecutor. At the outset, we note most of the complained of testimony and remarks were not objected to. An error not raised in the trial court must be plain error for an appellate court to reverse. *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804; Crim.R. 52(B). In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. *Long*. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. at paragraph three of the syllabus.
>
> ***
>
> ### GANG TESTIMONY
>
> During Captain Foster's redirect examination, the state attempted to broach the subject of appellant and gang involvement. T. at 323. Defense counsel objected and the trial court sustained the objection. *Id*. The state again attempted to bring up the subject of gang involvement during the cross-examination of appellant. T. at 833-835. Again, defense counsel objected. T. at 836. Following a discussion with the trial court, the state agreed to "withdraw the gang references." T. at 838.
>
> Appellant acknowledges the trial court's ruling, but claims the trial court should have given the jury a general admonition at the time of the ruling. Upon review of the jury instructions, we find the trial court did give the jury a general admonition. T. at 913. We find this admonition to be sufficient to avoid any prejudice to appellant.
>
> ### IMPROPER REMARKS BY PROSECUTOR
>
> Appellant argues the prosecutor made improper comments about his father being a "bad drunk," "sleeping on the bench in the courtroom throughout this trial," and about appellant receiving "blood money." T. at 826-827, 832. Defense counsel objected to the comments. The trial court sustained the objection as to the comments regarding appellant's father. T. at 827. As for the "blood money" comment, the trial court overruled the objection. T. at 832. Prior to this comment,

18

appellant admitted he "had an idea" the money another individual involved in the incident, Derek Fulton, was handing out to others had come from Mr. Welker's wallet. T. at 831. Based upon the very minimal amount of testimony in these areas, we find no prejudice to appellant.

Appellant also argues the prosecutor relied on hearsay testimony during his closing argument. Although appellant does not reference a specific line, we assume the complained of remark is "[s]omebody said, 'The dude might die.' " T. at 881. On direct examination, Timothy Pitcox, one of the individuals involved in the incident, testified to the following without objection (T. at 575):

A. On the ride back, there was a bunch of yelling. Someone was concerned that they might have killed him or something, and everyone's like, 'No, we didn't.' But one person says, 'I don't know. The dude might die or something,' so -

Q. Somebody said, 'The dude might die'?
A. Yeah. I don't know who it was or anything. There was a bunch of yelling and then a bunch of people like, 'No, we didn't. He won't. He's okay. He's going to be okay.' There was a bunch of yelling going west side, east side.

We fail to see how evidence not objected to by defense counsel and heard by the jury is not available for comment in closing argument.

Appellant also argues the prosecutor violated Crim.R. 16(C)(3) by commenting on appellant's witness list during his cross-examination. Crim.R. 16(C)(3) states "[t]he fact that a witness' name is on a list furnished under subsection (C)(1)(c), and that the witness is not called shall not be commented upon at the trial."

During appellant's cross-examination, the prosecutor questioned appellant about the identity of an individual called "Phantom" who appellant had claimed was also involved in the beating. T. at 841. The prosecutor made the following reference to appellant's witness list regarding corroboration of appellant's claim:

Q. So of your witness list, 20 or 30 people, nobody's going to come in and say they saw Phantom except you? T. at 843.

Technically, the prosecutor violated Crim.R. 16(C)(3). However, we fail to find this error so prejudiced the trial. Appellant admitted to

19

> participating in the beating and the subsequent disposal of Mr.
> Welker's body. It was of no consequence to appellant's culpability that
> yet another individual had been involved in the beating.
>
> Appellant further argues the state's cross-examination of appellant was
> abusive. T. at 854-855. We have reviewed the complained of questions
> in context and do not find them to have created undue prejudice to
> appellant. In fact, the state got appellant to admit he regretted what
> happened and he "should have handled it a different way." T. at 855.
> Such admissions, if anything, invoked sympathy for appellant.

Exhibit M to Return of Writ.[4]

The scope of federal habeas corpus review of a claim of prosecutorial misconduct is narrow.

A federal court does not sit as an appellate court employing supervisory powers to rectify ordinary

trial error in cases before it for habeas review. *Donnelly v. De Christoforo*, 416 U.S. 637 (1974).

Rather, the Court must consider only whether the prosecutor's conduct was so egregious as to deny

the petitioner fundamental fairness. *Id.* at 642-43; *Martin v. Foltz*, 773 F.2d 711, 716-17 (6th Cir.

1985), *cert. denied*, 478 U.S. 1021 (1986); *Angel v. Overberg*, 682 F.2d 605, 607 (6th Cir. 1982)(*en

banc*). This determination is made by evaluating the totality of the circumstances surrounding the

case. *Angel v. Overberg*, 682 F.2d at 607.

> Factors relevant in making this inquiry are: the degree to which the
> remarks may tend to mislead the jury and to prejudice the accused;
> whether the remarks were isolated or extensive; whether they were
> deliberately placed before the jury; and the strength of the case against
> the accused. Finally, this Court notes the "extreme nature of the
> prosecutorial misconduct required for a federal court to issue the
> writ."

---

[4] Portions of claim two may be procedurally defaulted. Due to trial counsel's failure to object at trial, it appears that some of petitioner's allegations were reviewed for plain error only. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). However, respondent did not raise this aspect of procedural default, which is an affirmative defense. *Trest v. Cain*, 522 U.S. 87 (1997); *Grey v. Netherland*, 518 U.S. 152, 165 (1996). The Court will therefore address the merits of all of claim two.

*Martin v. Foltz*, 773 F.2d at 716 (citations omitted)(quoting *Cook v. Bordenkircher*, 602 F.2d 117, 120 (6th Cir.), *cert. denied*, 444 U.S. 936 (1979)).

Again, the state court findings in this case are entitled to a presumption of correctness pursuant to 28 U.S.C. §2254(d), (e).  Upon review of the entire record, the Magistrate Judge concludes that petitioner has failed to establish that the state court findings are so unreasonable as to warrant federal habeas corpus relief.  *See Williams v. Taylor*, 529 U.S. 362 (2000).  This Court agrees with the state appellate court's conclusion that petitioner has failed to establish that he was prejudiced by the prosecutor's statements complained of, or that the remarks were of such an egregious nature, in light of the evidence presented, to warrant federal habeas corpus relief.

## V.  CLAIM FOUR

In his fourth claim for relief, petitioner asserts that he was denied a fair trial because "the jury was precluded from considering a lesser included offense without... first finding him not guilty of murder."  Although petitioner does not add any further specificity regarding this claim, the record indicates that petitioner argued to the state courts that he was denied due process because the jury was required to determine unanimously that petitioner was not guilty of involuntary manslaughter before it could consider the lesser included offense of felonious assault.  This Court therefore will consider that same claim here.

The trial court issued in pertinent part the following jury instructions:

> You must first consider the offense charged in count 1 of the indictment.  If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of murder, your verdict must be guilty as charged.
>
> If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense of murder, your verdict must be not guilty.

21

***

If you find that the State proved beyond a reasonable doubt all of the essential elements of the offense of involuntary manslaughter, your verdict must be guilty as charged; however, if you find that the State failed to prove beyond a reasonable doubt all of the essential elements of involuntary manslaughter, then your verdict must be not guilty to that offense, and in that event, you will continue your deliberations to decide whether the State has proved beyond a reasonable doubt all the essential elements of the lesser included offense of felonious assault.

If the evidence warrants it, you may find the defendant guilty of an offense lesser than that charged in the indictment; however, notwithstanding this right, it is your duty to accept the law as given to you by the Court, and if the facts and the law warrant a conviction of the offense charged in the indictment, namely, involuntary manslaughter, then it is your duty to make such finding uninfluenced by your power to find a lesser offense.

This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser offense.

*Transcript,* pp. 916-920.

The offenses charged in Count 1 and Count 2 of the indictment do not charge two separate offenses, but in effect charge that the defendant committed one or the other of such offenses.

If you find that the State proved beyond a reasonable doubt all of the essential elements of one offense, your verdict must be guilty as to that offense and not guilty as to the other. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of both offenses, your verdict must be not guilty as to both offenses.

*Id*., pp. 922-23.

You will have with you in the jury room the following verdict forms. There's three of them. The first verdict form – all the verdict forms have the style of the case, the case number, and it says, "Verdict" in caps. The first form reads: We, the jury, being duly impaneled and sworn, find the defendant, Samuel J. Musgrave – there's a blank line with instructions to insert in ink "guilty" or "not guilty" of the offense

22

of murder, as charged in Count 1 of the indictment.

If after your deliberations you determine that the State has proved beyond a reasonable doubt each and every one of the essential elements of the offense of murder, then your finding must be guilty. You would insert the word "guilty" and all 12 of you must sign.

If after your deliberations you determine that the State has failed to prove any one of the essential elements of the offense of murder, your finding on the murder verdict must be not guilty. You insert the words "not guilty" and, again, each of you would sign in ink.

If your finding on this verdict is guilty, that will conclude your deliberations. You will not proceed to deliberate on any other charges. If your finding is not guilty, you will then deliberate on the charge of involuntary manslaughter.

The second verdict form has the same style. It reads: We, the jury, being duly impaneled and sworn, find the defendant, Samuel J. Musgrave – a blank line with instructions to insert the word "guilty" or "not guilty" of the offense of involuntary manslaughter as charged in Count 2 of the indictment.

If after your deliberations you determine the State has proved each and every one of the essential elements of the offense of involuntary manslaughter, your verdict must be guilty. You would insert the term "guilty," and all 12 of you would sign.

If after your deliberations you determine that the State has failed to prove any one of the essential elements of the offense of involuntary manslaughter, you will insert the words "not guilty" and, again, all 12 of you will sign.

If your finding on this verdict form is guilty, that will conclude your deliberations. If your finding is not guilty, you will consider the lesser included offense.

The third verdict form reads: We, the jury, being duly impaneled and sworn, find the defendant, Samuel J. Musgrave – again, a blank line with instructions to insert either "guilty" or "not guilty" of the lesser included offense of felonious assault.

If after your deliberations you determine the State has proved each and every one of the essential elements of felonious assault, then your

finding must be guilty. You would insert the word "guilty" and all 12 of you would sign. If you find upon consideration of the lesser included offense that the State has failed to prove any one of the essential elements of the offense of felonious assault, you would insert the term – the words "not guilty." Again, all 12 of you would sign in ink, and that would conclude your deliberations.

First, you will deliberate on the murder charge. If you make a guilty finding, that concludes your deliberations. If you make a not guilty finding, you proceed to deliberate on the involuntary manslaughter charge. If you make a guilty finding on that charge, that would conclude your deliberations. If you make a not guilty finding on that charge, you would then go to deliberate on the lesser included offense of felonious assault. I hope that's clear.

When you have reached a verdict, you will complete the forms which correspond to your decision and sign the verdict form in ink.

Exhibit M to Return of Writ.

The state appellate court made the following findings regarding petitioner's claim:

Appellant claims the trial court erred in not permitting the jury to consider the lesser included offense of felonious assault without first finding him not guilty of involuntary manslaughter. We disagree.

The trial court instructed the jury on felonious assault as a lesser included offense of involuntary manslaughter. T. at 920-921. The trial court also instructed the jury that the murder charge and the involuntary murder charge were not two separate offenses but were alternative offenses. T. at 922-923. The jury was to first consider the charge of murder and, if a guilty verdict was not reached, then consider the charge of involuntary manslaughter. T. at 925-926. The jury convicted appellant of murder. Pursuant to the trial court's instructions, the jury never had a reason to consider the charge of involuntary manslaughter and the lesser included offense of felonious assault.

Exhibit M to Return of Writ.

Again, the state court's decision is entitled to a presumption of correctness, 28 U.S.C.

§2254(d), (e), and petitioner has failed to establish any reason for this Court to disturb those findings

24

here. *See Williams v. Taylor, supra,* 529 U.S. at 362.

To the extent that petitioner asserts that jury instructions violated state law, such issue is not appropriate for federal habeas corpus review. A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. §2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir.), *cert. denied*, 488 U.S. 866 (1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure'" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)). Only where the error resulted in the denial of fundamental fairness will habeas relief be granted. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).

Further, errors in jury instructions are generally not cognizable in federal habeas corpus unless they deprive petitioner of a fundamentally fair trial. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *see also Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986), *cert. denied*, 479 U.S. 1036 (1987); *Thomas v. Arn*, 704 F.2d 865, 868-69 (6th Cir. 1983). A habeas petitioner challenging jury instructions must establish that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). An omission or an incomplete instruction is less likely to be prejudicial than a misstatement of law. *Henderson,* 431 U.S. at 155.

Jury instructions requiring unanimous acquittal on the offense charged before the jury can

25

consider a lesser included offense are not constitutionally prohibited.  *See discussion, Zuern v. Tate*, 101 F.Supp.2d 948, 983 (S.D. Ohio March 30, 2000), *reversed on other grounds*, – F.3d –, 2003 WL 21665159 (6th Cir. July 17, 2003); *see also United States v. Cardinal*, 782 F.2d 34, 36-37 (6th Cir. 1986); *United States v. Jackson*, 726 F.2d 1466 (9th Cir. 1984);*Catches v. United States*, 582 F.2d 453, 459 (8th Cir. 1978); *United States v. Tsanas*, 572 F.2d 340, 346 (2nd Cir. 1978).

Claim four is without merit.

## VI.  CLAIM SIX, ELEVEN, AND THIRTEEN

In his sixth claim for relief, petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to properly examine juror McCartney, failed to object to admission of evidence regarding the victim's army service in Kuwait, failed to object to hearsay testimony by Captain Foster regarding information he obtained from police on their investigation of this case, and failure to request a curative instruction on the admission of improper evidence regarding petitioner's gang involvement.[5]  In his eleventh claim for relief, petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to request a jury instruction on accomplices.  In his thirteenth claim for relief, petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to request a jury instruction on abandonment.

The state appellate court made the following relevant findings regarding these claims:

> We note "the courts of this state have held that the defendant's repudiation of criminal intent must be unequivocal before an

_____

[5] It does not appear that petitioner ever presented to the state courts a claim of ineffective assistance of counsel due to his attorney's failure to request a curative instruction on admission of improper evidence of petitioner's gang involvement.  This claim, therefore, may be procedurally defaulted.  Again, however, respondent did not raise this aspect of procedural default, which is an affirmative defense.  *Trest v. Cain, supra*, 522 U.S. at 87; *Grey v. Netherland, supra*, 518 U.S. at 152.  This Court will therefore consider the merits of this claim.

26

instruction on abandonment will be warranted." *State v. Brumley* ( March 29, 1996), Portage App. No. 89- P-2092, unreported, at 36. The record indicates appellant denied he had criminal intent to participate in the murder in the first place. T. at 891, 898. " * * *[A]n accused is not entitled to an instruction on voluntary abandonment unless such was the defense at trial." *State v. Porter* (August 14, 1995), Stark App. No.1995CA00055, unreported at 3, citing *State v. Cooper* (1977), 52 Ohio St.2d 163, 370 N.E.2d 725.

***

Appellant claims his trial counsel was ineffective for failing to request an instruction on abandonment. We disagree.

The standard this issue must be measured against is set out in *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus, *certiorari denied* (1990), 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 768. Appellant must establish the following:

2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (*State v. Lytle* [1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623; *Strickland v. Washington* [1984], 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, followed.)

3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.

This court must accord deference to defense counsel's strategic choices made during trial and "requires us to eliminate the distorting effect of hindsight." *State v. Post* (1987), 32 Ohio St.3d 380, 388, 513 N.E.2d 754.

As stated in the previous assignment of error, the thrust of appellant's defense was to deny that he ever formulated the intent to participate in the murder in the first place. The affirmative defense of abandonment implies an initial intent to participate but then renunciation of that intent. One cannot abandon an intent that was never formulated. Appellant freely admitted to actively participating in the beating of Mr. Welker, the disposal of his body and the

27

subsequent disposal of Mr. Welker's vehicle at the gravel pit. T. at 797, 802, 808-809, 823, 856. Appellant was aware the plan was to place Mr. Welker's body in the water at the gravel pit. T. at 802, 839. Although appellant claims to have told the others that putting Mr. Welker in the water was "stupid" (T. at 802), he nonetheless continued to assist in the removal of the body from his house, transporting the body to the gravel pit and leaving the body at the gravel pit. Because of the continued participation of appellant, the defense of abandonment was never clearly established. T. at 839.

Upon review, we find no trial counsel deficiency on this issue and therefore no ineffective assistance of counsel.

\*\*\*

Appellant claims he was denied the effective assistance of trial counsel through numerous errors and omissions. We disagree.

The standard for ineffective assistance of counsel is cited *supra. Bradley; Strickland.*

Appellant argues his trial counsel was deficient in not questioning a specific juror, in not objecting to character evidence of the victim, in not objecting to hearsay evidence, in not objecting to testimony regarding gangs and in failing to request an instruction on accomplice testimony.

### JUROR QUESTIONING

Appellant argues his trial counsel should have questioned juror Richard McCarthy further regarding his familiarity with the case. Mr. McCarthy admitted he had read newspaper articles about the case, but agreed he did not have any preconceived opinions as to anything. T. at 22. Mr. McCarthy works as a printer for the local newspaper. He explained his job required him to read each article for spelling errors and problems, and he may come in contact with an article about the trial "if the story was printed on the days I work." T. at 29. The trial court attempted to rectify the situation and reserved ruling. T. at 29-30. Mr. McCarthy explained there were three press operators on a shift. T. at 29.

Mr. McCarthy is never questioned further nor is there any indication in the record as to how the trial court handled the problem of Mr. McCarthy's job duties vis a vis the general admonition not to read

anything about the trial. Clearly this matter should have been resolved, and establishes a deficiency by defense counsel. However, we fail to see how the deficiency prejudiced the outcome of the trial. Mr. McCarthy only glanced through articles for spelling errors and problems, he did not read articles in detail. T. at 30. There is no evidence in the record to establish that Mr. McCarthy ever had to proof an article about the trial or if any article was written giving out information not in evidence.

## CHARACTER EVIDENCE

Appellant argues his trial counsel erred in not objecting to testimony regarding Mr. Welker's military record. T. at 190-191. Upon review, we fail to find the testimony as to Mr. Welker's military status at the time of his death to be objectionable.

## HEARSAY/GANG EVIDENCE

Appellant argues Captain Foster was improperly permitted to testify as to his opinion on the state of the evidence and possible gang involvement. We have reviewed these arguments in Assignment of Error II and have found the testimony to be proper.

## ACCOMPLICE INSTRUCTION

Appellant argues two witnesses who testified, Kevin Phillips and Mr. Pitcox, were accomplices and therefore his trial counsel should have requested an instruction on accomplice testimony. *State v. Ferguson* (1986), 30 Ohio App.3d 171, 507 N.E.2d 388.

We have reviewed the testimony of both Mr. Phillips and Mr. Pitcox and although neither were indicted at the time of trial, we find Mr. Phillips clearly fits the description of an accomplice. Mr. Pitcox on the other hand, although he was present during the incident, was not a volunteer but was coerced into providing and driving his pick up truck. T. at 559-565, 681. Appellant concedes in his own testimony that Mr. Pitcox was coerced. T. at 800-801.

Mr. Phillips's account of the beating was identical to appellant's version. T. at 674-677, 795-798. The testimony was also the same regarding the removal and disposal of the body. T. at 681-685, 801-805. We find Mr. Phillips was an accomplice in the incident, and the failure to request the instruction establishes a deficiency by defense counsel. However, we fail to see how the deficiency

29

prejudiced the outcome of the trial. Mr. Phillips's testimony corroborated appellant's own version of the events and did not include testimony on what actually happened to Mr. Welker once he was dumped in the gravel pit.

Upon review, we find no prejudice to appellant.

Assignment of Error VI is denied.

Exhibit M to Return of Writ.

Again, petitioner has failed to establish that the state court's decision is so unreasonable as to justify federal habeas corpus relief. *Williams v. Taylor, supra*, 529 U.S. at 362.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Strickland,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Id*. at 697.

The state appellate court concluded that a jury instruction on abandonment would have been inappropriate in view of the undisputed facts of this case. Similarly, the state appellate court held that admission of evidence regarding the victim's military career was appropriate, as was testimony by Captain Foster regarding his investigation:

> Appellant argues Captain Foster was permitted to give hearsay testimony and references this court to questions asked by appellant's own counsel during Captain Foster's cross-examination. T. At 307, 309. 310. In fact, the state objected to this line of questioning but the trial court overruled the objection. T. At 308-309. On redirect, Captain Foster explained how during the course of his investigation he found no other relevant evidence at the gravel pit (T. At 318), and how he determined the individuals present at the party during the incident. T. At 322-323. The redirect did not elicit hearsay, but the results of Captain Foster's investigation, including other individuals yet to be charged. T. At 326-329. The names of the individuals at the party during Mr. Welker's beating were freely given during appellant's own testimony. T. At 795.
>
> Upon review, we find that any hearsay was in fact initiated by appellant's own counsel. T. At 339. It is well accepted law a party is not permitted to complain of an error which said party invited or induced the trial court to make. *State v. Kollar* (1915), 93 Ohio St. 89.

Exhibit M to Return of Writ.[6]

A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and

---

[6] As discussed, *supra*, the state trial court sustained trial counsel's objection to testimony by Foster regarding petitioner's gang involvement.

31

procedure'" in considering a habeas petition.  *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).  Nothing in the record before this Court indicates that the state appellate court's findings were unreasonable.  Because evidence of Welker's military service and testimony by Foster was admissible under Ohio law, and because the evidence did not warrant a jury instruction on abandonment, trial counsel's performance was not constitutionally unreasonable in these respects.

The record reflects that juror Richard McCartney stated as follows during *voir dire*:

> McCARTNEY: Just what I know is what I've read in the newspaper.
>
> COURT: Because of what you've read in the newspaper, do you have a preconceived opinion as to anything involved in this case?
>
> McCARTNEY: No, sir.
>
> COURT: And you're not related to and you don't know the defendant in this matter?
>
> McCARTNEY: No, sir.

*Transcript*, at 22.

> COURT: ... Do any of you know of any reason why you couldn't serve on this jury?...
>
> Mr. McCartney?
>
> McCARTNEY: I do work for the newspaper as a printer.  Sometimes I do come in contact with reporters.
>
> COURT: Okay.  And there is a reporter in the courtroom or there was. I don't know what happened to him.  And this matter is being covered by the "Mount Vernon News," and I'm going to instruct you at the end of the day to not read any article written in the newspaper.  Like I just told you, I want a decision made on what you see and hear in the courtroom and not a decision based on what the reporter for the news or the reporter for the radio station saw and heard.  And would it be impossible for you to do your job without reading the story in detail?
>
> McCARTNEY: No, sir.

32

>COURT: ... You could do your job seriously?
>
>McCARTNEY: No.  Honestly, I am a printer.  I have to read.  I wouldn't read the story in detail, but I would have to read the story for spell checks and problems if the story was printed on the days I work.
>
>COURT: Is that the only problem regarding your employment?
>
>McCARTNEY: Yes.  That's the only problem.
>
>MR. BAKER: No one else could do that particular story?
>
>McCARTNEY: There's three press operators.  We all look at the same newspaper as it runs.
>
>MR. BAKER: Well, if that's the only problem, if there's any way he could avoid reading it, we'd prefer to keep him on; otherwise, we have no choice.
>
>[DEFENSE COUNSEL]: Yeah.
>
>***
>
>COURT: Let me – let's keep you on at this time, Mr. McCartney, and maybe there's something I can do to help that we can work with your job, maybe get somebody else to at least handle that particular aspect of it.
>
>McCARTNEY: Okay.

*Id*., at 29-30.  As noted by the state appellate court, the record does not reflect that McCartney was examined further by the defense or by the trial court regarding the possibility that he might be required to read articles about the case during trial.  However, the record likewise fails to reflect that McCartney was biased, or unable to sit as an impartial juror in this case.  Therefore, even assuming that trial counsel's performance was constitutionally inadequate under the first prong of *Strickland,* petitioner cannot demonstrate prejudice.

>Even if a defendant shows that particular errors of counsel were unreasonable... the defendant must show that they actually had an

33

adverse effect on the defense.

It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test.... and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

***

When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

***

In making this determination, a court... must consider the totality of the evidence.... [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Strickland, supra*, 466 U.S. at 693-96.  In the absence of any indication of juror bias, petitioner cannot meet this standard here.

For the reasons discussed by the state appellate court, this Court likewise concludes that petitioner has failed to establish the ineffective assistance of counsel under the *Strickland* test due to counsel's failure to request a jury instruction on testimony of accomplices.  O.R.C. §2923.03(d) provides:

If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

34

> "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

*Id.*

The testimony of Phillips and Pitcox was cumulative to and corroborated petitioner's testimony. Other prosecution witnesses also corroborated the testimony of Phillips, Pitcox, and petitioner. It was undisputed that an altercation arose when Derek Fulton heard that Welker touched his girlfriend inappropriately. All witnesses agreed that petitioner held Welker while others beat him. When petitioner released his hold on Welker, Welker fell to the ground, and was then repeatedly kicked by petitioner and others. Thereafter, Welker was placed into the back of Pitcox's truck. Petitioner and others left Welker at the quarry, unconscious and severely beaten, but apparently still alive. These facts were undisputed. It was petitioner's defense that he never placed Welker's body into the water, and did not mean to kill him. Petitioner said that he was surprised when he learned that Welker was dead. *Transcript*, at 811, 815, 817. However, neither Phillips nor Pitcox saw whether petitioner left Welker in the water. *Id.*, at 684-685. Additionally, the trial court issued a general instruction to the jury on witness credibility:

> You are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence. To weigh the evidence, you must consider the credibility of the witnesses, including the defendant. You will apply the tests of truthfulness which you apply in your daily lives. These tests include the appearance of each witness upon the stand; his manner of testifying, the reasonableness of the testimony; the opportunity he or she had to see, hear, and know the things concerning which they testified; their accuracy of memory; frankness or lack of

> it; intelligence; interest and bias, if any; together with all of the facts
> and circumstances surrounding the testimony.  Applying these tests,
> you will assign to the testimony of each witness such weight as you
> deem proper.
>
> You are not required to believe the testimony of any witness simply
> because he or she was under oath.  You may believe or disbelieve all
> or any part of the testimony of any witness.  It is your province to
> determine what testimony is worthy of belief and what testimony is
> not worthy of belief.

*Id.*, at 913-914.

In view of all of the foregoing, and in view of the substantial evidence of guilt, petitioner has

failed to establish that the state court's decision denying his claim of ineffective assistance of counsel

is contrary to, or an unreasonable application of clearly established federal law, or based upon an

unreasonable determination of the facts so as to justify federal habeas corpus relief.

Claims six, eleven, and thirteen are without merit.

## VII.  CLAIMS SEVEN AND EIGHT

In his seventh claim for relief, petitioner asserts that he was denied a fair trial due to improper

jury instructions on "complicity" and "aiding and abetting."   The state appellate court made the

following findings regarding this claim:

> Appellant claims the trial court's instruction on aiding and abetting
> was improper because it did not define "purpose." We disagree.
>
> The giving of jury instructions is within the sound discretion of the
> trial court and will not be disturbed on appeal absent an abuse of
> discretion. *State v. Martens* (1993), Ohio App.3d 338. Jury
> instructions must be reviewed as a whole. *State v. Coleman* (1988), 37
> Ohio St.3d 286, 525 N.E.2d 792.
>
> The trial court defined "purpose" during the instruction on the
> essential elements of murder, R.C. 2902.01. T. at 915-916. The trial
> court went on to define "cause" and "aiding and abetting." T. at 916.
> Given the fact the trial court defined all of the terms in order, we do

36

not find the instructions were deficient or confusing.

Upon review, we find the trial court's instruction on aiding and abetting was proper.

Exhibit M to Return of Writ.

The trial court instructed the jury as follows:

> [T]he defendant is charged with murder.  Before you can find the defendant guilty of murder, you must find beyond a reasonable doubt that on or about the 3rd day of August, 1997, and in Knox County, Ohio, the defendant purposely caused the death of Robert Welker or purposely aided or abetted another in causing the death of Robert Welker.
>
> Purpose to cause the death of another is an essential element of the crime of murder.
>
> A person acts purposely when it is his specific intention to cause a certain result.  It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to cause the death of Robert Welker.
>
> Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result.  To do an act purposely is to do it intentionally and not accidentally.  Purpose and intent mean the same thing.  The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.
>
> The purpose with which a person brings about a result is determined from the manner in which it is done, the means used, and all of the other facts and circumstances in evidence.
>
> ***
>
> Aid means to help, assist, or strengthen.  Abet means to encourage, counsel, incite, or assist.

*Transcript*, 915-916.

In claim eight, petitioner asserts that he was denied a fair trial because the trial court failed

37

to instruct the jury that a unanimous verdict of guilt was required.  Petitioner properly raised such

claim on direct appeal; however, the state appellate court reviewed the claim for plain error only due

to petitioner's failure to object to the jury instructions that were issued:[7]

> Appellant claims the trial court erred in not instructing the jury that
> they must unanimously agree upon whether appellant was the
> principle offender or an aider and abettor. We disagree.
>
> We note there was no objection to the jury charge nor any request for
> a specific finding on principle offender versus aider and abettor. *See*,
> Crim.R. 30(A), *supra.* Apart from the failure to object to the charge or
> request a specific finding, R.C. 2923.03(F), as discussed in the
> previous assignment of error,[8] makes no distinction in culpability

---

[7] Claim eight appears to be procedurally defaulted; however, respondent did not raise
this aspect of procedural default, which is an affirmative defense.  *See Trest v. Cain, supra*, 522
U.S. at 87; *Grey v. Netherland, supra, 518 U.S. at 165.*

[8] In the previous assignment of error referred to by the state appellate court, the appellate
court held:

Appellant claims he was denied due process when the indictment was amended.
We disagree.

The indictment included one count of murder in violation of R.C. 2903.02 and
one count of involuntary manslaughter in violation of R.C. 2903.04. The trial
court instructed the jury on aiding and abetting in violation of R.C. 2923.03. Said
statute at subsection (F) specifically states "[w]hoever violates this section is
guilty of complicity in the commission of an offense, and shall be prosecuted and
punished as if he were a principal offender. A charge of complicity may be stated
in terms of this section, or in terms of the principal offense."

In the bill of particulars filed February 12, 1998, the state included the following
complicity language:

On or about the 3rd day of August, 1997, in the County of Knox, State of Ohio,
SAMUEL J. MUSGRAVE did commit MURDER by purposely causing the death
of Robert Welker contrary to and in violation of Section 2903.02(A) of the
Revised Code of Ohio, and contrary to the form of the statute in such case made
and provided and against the peace and dignity of the State of Ohio. More
specifically, on or about the 3rd day of August, 1997, SAMUEL J. MUSGRAVE

between the principle [sic] offender and the aider and abettor.

Exhibit M to Return of Writ.

The record reflects that the jury additionally was instructed in relevant part as follows:

> Consult with one another, consider each other's views, and deliberate with the objective of reaching an agreement if you can do so without disturbing your individual judgment.... Do not hesitate to change an opinion if convinced that it is wrong; however, you should not surrender honest convictions in order to be congenial or to reach a verdict solely because of the opinion of the other jurors.
>
> ***
>
> If after your deliberations you determine that the State has proved beyond a reasonable doubt each and every one of the essential elements of the offense of murder, then your finding must be guilty. You would insert the word "guilty" and all 12 of you must sign.
>
> If after your deliberations you determine that the State has failed to prove any one of the essential elements of the offense of murder, your finding on the murder verdict must be not guilty. You insert the words "not guilty" and, again, each of you would sign in ink.

*Transcript*, at 925-926.  The jury was similarly instructed as to the requirement of a unanimous verdict on involuntary manslaughter and on all of the lesser included offenses.  *Id.*, at 92926-928.

As discussed, *supra,* errors in jury instructions are generally not cognizable in federal habeas corpus unless they deprive petitioner of a fundamentally fair trial.  *Henderson v. Kibbe, supra*, 431

---

purposely caused and/or purposely aided and abetted another in causing the death of Robert Welker by means of intentionally holding, choking and striking Robert Welker and/or of intentionally disposing of Robert Welker's body in a manner which would cause his death by drowning in the event that he was not already dead.

Appellant was put on notice that he was charged not only as a principle [sic] offender but also as an aider and abettor some twelve days before the commencement of the trial. We find the indictment was not amended. Appellant was not denied due process.

U.S. at 154; *Wood v. Marshall, supra* 790 F.2d at 551.  A habeas petitioner challenging jury instructions must establish that "the ailing instruction... so infected the entire trial that the resulting conviction violated due process." *Cupp v. Naughten, supra*, 414 U.S. at 147.  In view of the record, and for the reasons discussed by the state appellate court, this Court concludes that such are not the circumstances here.

Claims seven and eight are without merit.

## VIII.  CLAIM NINE

In claim nine, petitioner asserts that he was denied a fair trial due to admission of testimony regarding a "sock test" by Captain Foster.  Petitioner asserts:

> To prove [that] a deceased victim who was believed to [have]... drowned did not walk into the water himself, Captain Foster purchased six pair of similar socks [as] were found on the victim and walked into the water six different times with a new pair of socks each time to prove the debris found on the socks of the victim were different than the debris found on the test socks of Captain Foster, thus supposedly proving the victim did not walk into the water himself.

> However, the test socks, once tested, were placed in tap water for an unlike amount of time that the victim was in the water [sic] in a small pond.

*See Second Amended Petition*, Doc. No. 18.

The state appellate court rejected this claim as follows:

> Appellant claims the trial court erred in admitting evidence of "junk science testimony" regarding a test performed by Captain Dennis Foster of the Knox County Sheriff's Department. We disagree.

> In *State v. Fulton* (April 26, 1999), Knox App. No. 98CA14, unreported, a case involving a co-defendant herein, this court reviewed a similar challenge to this evidence and upheld its admissibility. This court found Captain Foster's test complied with Evid.R. 702(C), Evid.R. 402 and the Supreme Court of Ohio's decision in *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 687 N.E.2d

40

735. Appellant herein makes the further argument that Captain Foster was not an "expert" pursuant to Evid.R. 702(A) and (B). Said sections state as follows:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

Mr. Welker's dead body was discovered floating in water at a commercial gravel pit. At the time of discovery, Mr. Welker's body was wearing a pair of white socks only. Captain Foster performed a test wherein he wore a pair of socks similar to Mr. Welker's and walked into the water from the point where blood spots were discovered (six inches from the water's edge). T. at 270-272. Captain Foster performed this test to determine "if there was any effect on the socks and make a comparison to the socks on the victim" as far as the contents of the mud and so forth. T. at 269. In essence, Captain Foster performed the test to determine if Mr. Welker "indeed walked into the water [causing his own death] or did not walk into the water." *Id*. Captain Foster did not testify as an expert. In fact, the prosecutor asked Captain Foster questions "from a layman's point of view." T. at 273. As we held in *Fulton*, Captain Foster's test was merely a similar reenactment.

Exhibit M to Return of Writ.[9]

---

[9]  In *State v. Fulton, supra*, the state appellate court rejected a similar claim by co-defendant Derek Fulton as follows:

Appellant claims the trial court erred in admitting evidence of a "quasi-scientific test" performed by Captain Dennis Foster of the Knox County Sheriff's Department. We disagree.

The admission or exclusion of evidence rests in the trial court's sound discretion. *State v. Sage* (1987), 31 Ohio St.3d 173, 510 N.E.2d 343. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140.

41

Mr. Welker's dead body was discovered floating in a pond at a commercial gravel pit. Mr. Welker's body had sustained a severe beating. At the time of discovery, Mr. Welker's body was wearing a pair of white socks only. Captain Foster performed a test wherein he wore a pair of socks similar to Mr. Welker's and walked into the pond from the point where blood spots were discovered (six inches from the pond's edge). T. at 226-227. Captain Foster performed this test to determine "if there would be any difference between our socks and the socks that the victim was wearing as far as the contents of the mud and so forth." T. at 226. In essence, Captain Foster performed the test to disprove the theory that Mr. Welker had walked into the pond causing his own death. Captain Foster performed this test on five different pairs of socks. One pair was soaked in water for approximately thirty hours, the same amount of time Mr. Welker's body was determined to have been in the pond. T. at 229. All five pairs of socks were then analyzed and compared to the stains and debris found on Mr. Welker's socks. G. Michele Yezzo, a forensic scientist with the State Bureau of Criminal Investigation, testified the debris on the five pairs of test socks were not the same as the debris found on Mr. Welker's socks. T. at 272-273.

Appellant argues the test socks were tested under dissimilar conditions because the tests consisted of merely walking into the pond when in fact Mr. Welker was believed to be in the water in excess of forty-eight hours. Appellant argues the tests confused the jury, were unreliable and probative of nothing. Appellant further argues the tests were not relevant under Evid.R. 402 and were inadmissible pursuant to the Supreme Court of Ohio's decision in *Miller v. Bike Athletic*

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. All relevant evidence is generally admissible and irrelevant evidence is not. Evid.R. 402. In Miller at paragraph two of the syllabus, the Supreme Court of Ohio held "[w]hen an out-of-court experiment is not represented to be a reenactment of the accident and deals with one aspect or principle directly related to the cause

***

... There is essentially no dispute Mr. Welker was severely beaten by appellant and others, taken to the deserted gravel pit and abandoned within six inches of the water's edge. At trial, appellant argued there was no direct evidence that he and the others put Mr. Welker in the water. T. at 614. Based upon the defense theory of the case, it was relevant to disprove the allegation that Mr. Welker walked into the water on his own accord. Therefore, we find the issue of how Mr. Welker got

42

Federal habeas review of state court evidentiary rulings is extremely limited.  *Waters v. Kassulke,* 916 F.2d 329, 335 (6th Cir. 1990).  Evidentiary questions generally do not rise to a constitutional level unless the error was so prejudicial as to deprive a defendant of a fundamentally fair trial, thereby violating due process.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *see also Walker v. Engle,* 703 F.2d 959, 962 (6th Cir. 1983), *cert. denied*, 464 U.S. 962 (1983).  When such errors are alleged, the federal court's inquiry in reviewing these claims is directed to whether the evidence was rationally connected to the crime charged.  *Carter v. Jago*, 637 F.2d 449, 457 (6th Cir. 1980), *cert. denied*, 456 U.S. 980 (1982).  Upon review of the entire record, and for the reasons discussed by the state appellate court, the Court concludes that admission of the evidence complained of did not deprive petitioner of a constitutionally fair trial.

## IX.  CLAIM TEN

In claim ten, petitioner asserts that he was denied a fair and impartial jury due to pre-trial publicity.  Specifically, petitioner asserts that his trial should have been transferred to another county

---

into the water to be relevant and the sock tests to be probative of that issue.

Our next inquiry is whether the sock tests pass the requirements of *Miller*. Because the tests *sub judice* were not represented as reenactments, duplicative reenactment was not required. Our inquiry is limited to whether the reenactment was similar. Mr. Welker was discovered with his socks on only; Captain Foster wore similar socks five different times; the environmental conditions were similar; the path taken to the water was from the blood spots discovered near the water's edge; and one pair of socks was placed in water, albeit not gravel pit water, for thirty hours to simulate Mr. Welker's time in the water. Upon review, we find the reenactment was indeed similar and qualified under Miller and Evid.R. 702(C). The trial court did not err in admitting the sock tests.

*Id.*

because Carl McMahon said during voir dire that he "had some friends that used to be neighbors" with the victim, and Joseph Walters said that he had heard about the case and talked about it at work. *Transcript,* at 87, 104. Additionally, Marilyn Miletic said, "Well, something had to get him here," in response to the question, "Does the fact that Sam was indicted cause any of you to believe he was guilty or he had to do something to get himself indicted?" *Id.,* at 49. Margaret Eesley had read about the case in the paper, and Brian Antill knew the victim from high school:

> BRIAN ANTILL: Well, I knew the victim. I graduated with him from high school.
>
> COURT: How well did you know the victim?
>
> ANTILL: I don't know. Played football with him in junior high.
>
> COURT: Did you have any contact with him since you've left high school?
>
> ANTILL: No, not at all. I read he was found in the gravel pit undressed, beaten severely.
>
> COURT: Have you made any determination as to who, if anyone, is responsible for this?
>
> ANTILL: I don't know.

*Id.,* at 20. Faith Kirk-O'Brien wondered how one could disregard something that had been heard in the courtroom after being so instructed, and because Richard McCartney said that he had read about the case in the newspaper. *Id.,* at 55, 22.

The state appellate court rejected this claim as follows:

> Appellant claims he was denied the right to a fair and impartial jury. We disagree.
>
> Appellant challenges the impartiality of seven jurors. Appellant argues these jurors "had exposure to the case or were familiar with the case in one form or another." *Appellant's Brief* at 4.

In *Irvin v. Dowd* (1961), 366 U.S. 717, 722-723, 81 S.Ct. 1639, 6 L.Ed.2d 751, the United States Supreme Court held the following:

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

In *State v. White* (1998), 82 Ohio St.3d 16, 21, 693 N.E.2d 772, quoting *State v. Maurer* (1984), 15 Ohio St.3d 239, 252, 473 N.E.2d 768, the Supreme Court of Ohio stated "if 'the record on *voir dire* establishes that prospective veniremen have been exposed to pretrial publicity but affirmed they would judge the defendant solely on the law and the evidence presented at trial, it is not error to empanel such veniremen.' "

A review of the *voir dire* establishes each of these seven jurors agreed to set aside their preconceived notions about the case and base their respective decision on the facts and law as presented. T. at 22, 45-46, 48-49, 59-60, 74, 88-89, 106-107. We note appellant did not make any challenges for cause. T. at 80, 92, 102, 107, 113. Upon review, we find appellant was not denied the right to a fair and impartial jury.

Exhibit M to Return of Writ.

Again, the decision of the state appellate court is entitled to a presumption of correctness pursuant to 28 U.S.C. §2254(d), (e), and review of the record reveals no reason for this Court to disturb the state court's findings here. *See Williams v. Taylor, supra.*

The record fails to reflect that there existed pretrial publicity of such a nature that petitioner could not receive a fair trial. *See, e.g. Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381

45

U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Irvin v. Dowd*, 366 U.S. 717 (1961). This case was not one with a "trial atmosphere... utterly corrupted by press coverage," or where "influence of the news media... pervaded the proceedings," nor was petitioner's trial conducted in a "circus atmosphere." *See Murphy v. Florida*, 421 U.S. 794, 798-99 (1975)(citations omitted). Further, the record does not reflect a "pattern of deep and bitter prejudice" by potential jurors or "so huge a wave of public passion" that petitioner could not receive a fair trial in this district. *See Irvin v. Dowd, supra*, 366 U.S. at 727-28 (citations omitted). Additionally, nothing supports petitioner's claim that any particular juror was biased against him.

> It is not required... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd, supra*, 366 U.S. at 722-23. As noted by the state appellate court, review of the record indicates that all of the jurors referred to by petitioner stated that they could sit as fair and impartial jurors.

> COURT: Because of what you've read in the newspaper, do you have a preconceived opinion as to anything involved in this case?
>
> RICHARD MCCARTNEY: No, sir.

*Transcript*, at 22.

> COURT: Do you have something going on, religious beliefs, strongly held political beliefs that are going to dictate what you decide in this

46

matter?

FAITH KIRK-O'BRIEN: No.

*Id*., at 46.

COURT: Can you grant him the presumption of innocence?

BRIAN ANTILL: Yes.

COURT: And if he exercises his constitutional right not to take the stand, can you not consider that factor alone?

ANTILL: Until he's proven guilty beyond a reasonable doubt.

*Id*., at 60.

MARGARET EESLEY: I did read it in the paper but don't have any preconceived –

*Id*., at 74.

COURT: Could you put all that out of your mind and make a decision based solely on what you see and hear here in the courtroom over the next three or four days?

CARL MCMAHON: Yes.

So you do not have a preconceived opinion as to the guilt or innocence of Mr. Musgrave, is that a correct statement?

MCMAHON: Yeah.

COURT: ... [A]ny other reason why you couldn't serve on this jury?

MCMAHON:  No.

*Id*., at 88-89.

[DEFENSE COUNSEL] MR. MAYHEW: There's been a lot of rumors.  I'm sure you can hear anything you want to hear.  You won't have any trouble setting that aside if you're selected to serve on this jury?

47

JOSEPH WALTERS: No, sir.

MAYHEW: And determine it solely on what you hear in this courtroom?

WALTERS: Yes.

MAYHEW: You don't have any problems – you don't feel that if you did go back to work somebody will say, hey – if you return a not guilty, hey, why did you let that killer go?

WALTERS: No.

MAYHEW: That won't enter into your decision at all?

WALTERS: No.

MAYHEW: If your verdict should be not guilty, you'll sign that verdict?

WALTERS: Yes, sir.

MAYHEW: Likewise, if there's 11 other people that think guilty but you firmly believe that the State hasn't proved it, you won't crumble merely because of the odds?

WALTERS: No.

Claim ten is without merit.

## X.  CLAIM TWELVE

In claim twelve, petitioner asserts that he was denied a fair trial due to a constructive

amendment of the indictment:

> Petitioner was indicted for murder.  However... the trial court allowed the indictment to be constructively amended to a theory of complicity/aiding and abetting.  A bill of Particulars cannot amend an indictment.

*See Second Amended Petition*, Doc. No. 18.

The state appellate court made the following findings regarding this claim:

48

Appellant claims he was denied due process when the indictment was amended. We disagree.

The indictment included one count of murder in violation of R.C. 2903.02 and one count of involuntary manslaughter in violation of R.C. 2903.04. The trial court instructed the jury on aiding and abetting in violation of R.C. 2923.03. Said statute at subsection (F) specifically states "[w]hoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense."

In the bill of particulars filed February 12, 1998, the state included the following complicity language:

On or about the 3rd day of August, 1997, in the County of Knox, State of Ohio, SAMUEL J. MUSGRAVE did commit MURDER by purposely causing the death of Robert Welker contrary to and in violation of Section 2903.02(A) of the Revised Code of Ohio, and contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Ohio. More specifically, on or about the 3rd day of August, 1997, SAMUEL J. MUSGRAVE purposely caused and/or purposely aided and abetted another in causing the death of Robert Welker by means of intentionally holding, choking and striking Robert Welker and/or of intentionally disposing of Robert Welker's body in a manner which would cause his death by drowning in the event that he was not already dead.

Appellant was put on notice that he was charged not only as a principle offender but also as an aider and abettor some twelve days before the commencement of the trial. We find the indictment was not amended. Appellant was not denied due process.

Exhibit M to Return of Writ. This Court agrees with the conclusion of the state appellate court.

The due process clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense. *See, e.g., In Re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *Blake v. Morford*, 563 F.2d 248 (6th Cir.1977); *Watson v. Jago*, 558 F.2d 330, 338 (6th Cir.1977). This requires that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged. Such definiteness and certainty are required as will

49

> enable a presumptively innocent man to prepare for trial. *Combs v. Tennessee*, 530 F.2d at 698.

*Koontz v. Glossa,* 731 F.2d 365, 369 (6th Cir. 1984). Review of the record reveals that the State complied with these requirements here.

Claim twelve is without merit.

**XI.**

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp

United States Magistrate Judge